The appellant, Mary Jane Files, was indicted on a charge of intentional murder.[1] She was found guilty at trial of the *Page 908 
lesser offense of criminally negligent homicide. The trial court sentenced her to 12 months in the county jail.
The State's evidence tended to show the following: Mary Jane Files was the sole beneficiary under the will of her aunt, Juanita Jones. She also was the beneficiary of several insurance policies, annuities, and certificates of deposit owned by her aunt. In March 1996, Files was appointed Jones's conservator and guardian. She moved Jones into her home and, with the help of several professional health-care providers, cared for her until Jones's death on February 10, 1997. Jones suffered from advanced Alzheimer's disease and was nonresponsive, bedridden, and unable to communicate or to care for herself. She received artificial nutrition and water through a feeding tube that had been surgically implanted in her stomach in 1993. Certified nursing assistant Naomi Moreno, whom Files hired to help care for Jones, testified that she began caring for Jones full-time in May 1996. In October or November 1996, Files began instructing Moreno to dilute Jones's artificial nutrition with water, to substitute water for the nutrition, to reduce the amount of the nutrition, and to disconnect or turn off the feeding tube for substantial periods. Moreno reported Files's orders to authorities and quit working for Files on January 31, 1997. The coroner testified that, at the time of her death, Jones was suffering from cachexia (malnourishment or starvation) and that her death was the result of abuse and/or neglect. Files testified that she took appropriate care of her aunt and she called two expert witnesses who disputed the cause of death. In rebuttal, the State called an expert who testified that Jones had died from nutritional depletion and that condition was not a normal symptom of Alzheimer's disease.
 I.
Files contends that the withdrawal of artificial nutrition and hydration to a terminally ill patient does not constitute criminal homicide as a matter of law. She argues that she is not guilty of any criminal offense because she did nothing more than "allow the natural process of dying to occur." She further argues that the Alabama Natural Death Act, §§ 22-8A-1 et seq., Ala. Code 1975, reflects Alabama's policy in favor of the natural process of dying. She contends that this is a case of first impression because current Alabama caselaw that addresses death by starvation involve infants or young children, rather than an elderly person who is in the process of dying from another cause and who would die if her life was not artificially sustained.
Section 22-8-11 of the Alabama Natural Death Act permits a surrogate to withdraw or withhold life-sustaining treatment and artificially provided nutrition and hydration, if certain conditions are satisfied. However, "artificially provided nutrition and hydration" were added in an amendment that became effective on April 15, 1997. When Juanita Jones died on February 10, 1997, the Alabama Natural Death Act contained no provision permitting a caretaker to withhold artificially provided nutrition and hydration. Furthermore, Files concedes that the requirements of the Natural Death Act were not met.
Files had no statutory right to withhold nutrition and water from Jones. She argues, however, that even given the absence of such a right, her actions did not constitute a crime. Section 13A-6-4(a), Ala. Code 1975, provides the following: "A person commits the crime of criminally negligent homicide if he causes the death of another person by criminal negligence." Files argues that she did not cause Jones's death by criminal negligence because *Page 909 
Jones was already dying of natural causes. However, §13A-2-5(a), Ala. Code 1975, provides:
 "A person is criminally liable if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was sufficient to produce the result and the conduct of the actor clearly insufficient."
Jones's life had been sustained by means of a feeding tube since 1993. She continued to survive until Files interfered by withholding from her the nutrition and water. The State's expert testified that the nutritional depletion that caused Jones's death was not a normal result of Alzheimer's disease. No evidence was presented indicating that if Jones had been provided nutrition and water she still would have died on February 10, 1997. Cf. Ex parte Lucas, 792 So.2d 1169
(Ala.Crim.App. 2000) (in order to prove causation in a capital-murder case, referring to medical-malpractice law that a mother who withheld medical treatment from her injured child could be convicted only if the child's death would not have occurred but for her failure to provide medical treatment).
In Dill v. State,, 600 So.2d 343 (Ala.Crim.App. 1991), this court held that, where a wound inflicted by the defendant was dangerous to life, the fact that there were other contributing causes to the victim's death did not prevent the wound from being the legal cause of death. The present case is similar. Withholding nutrition and water clearly ended Jones's life, and the fact that she also suffered from Alzheimer's did not prevent the nutritional depletion caused by Files from being the legal cause of her death.
 II.
Files also contends that the trial court erred in allowing sheriff's detective Wayne Lowe to testify that "there could have been foul play" involved in Jones's death. She argues that the statement was nonresponsive and prejudicial and expressed an opinion on the ultimate issue in the case.[2]
The record reveals the following:
 "Q. [Prosecutor] Did your lieutenant assign you to this case?
"A. He did.
 "Q. And did he give you some information regarding as to [sic] what you should be doing in this case?
"A. It was —
 "[Defense counsel]: Object to anything he may have said. That would be hearsay.
 "[Prosecutor]: Judge, I'm not offering it for the truth of the matter asserted, I'm merely offering it to show what effect it had upon this listener in doing his job as an investigator? [sic]
"A. Yes, he did.
 "[Other defense counsel]: Well, now, Judge, he's going to answer whether you rule or not.
 "THE COURT: Well, let me rule. But I'm going to overrule and let him answer to this point. So, he's already answered. Ask your next question. But wait until I rule on the objection.
 "Q. So, you received some information from your lieutenant to conduct an investigation in this case, correct?
"A. I did.
 "Q. And based upon that information, what actions did you take as the investigator for Jefferson County Sheriff's department? *Page 910 
 "A. After reading the report and had [sic] the information that I did that there could have been foul play —
"[Defense counsel]: I object to that and move to exclude.
 "[Other defense counsel]: Calls for an opinion. It's based on hearsay.
 "[Prosecutor]: Again, judge, this witness is an investigator. He's asked to act upon information. It does not go to the truth of the matter asserted.
"THE COURT: Overruled.
 "Q. Thank you, Judge. And based on that information and you're case agent and you start doing what?
 "A. I called Ms. Naomi Moreno, who had called the office and gave this information. And I set up a time for her to come to the office for an interview."
The trial court did not err in admitting Lowe's answer into evidence. A witness may testify to his opinion if the opinion is a "collective fact" or a "shorthand rendition of fact." Hale v. State, 673 So.2d 803
(Ala.Crim.App. 1995). Here, Lowe was summarizing information that Naomi Moreno had provided to the sheriff's department. His statement was a shorthand way of conveying the details contained in her report. Lowe subsequently testified that, based on Moreno's information, he contacted the coroner and the funeral home so that an autopsy could be performed on the body of Juanita Jones.
Moreover, any error in the admission of Lowe's answer would have been harmless. After Lowe's testimony, Naomi Moreno testified to the facts she had reported to the sheriff's office. "Testimony that may be apparently inadmissible may be rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred." McFarley v. State, 608 So.2d 430, 433 (Ala.Crim.App. 1992).
 III.
Files's third contention is that the trial court erred in refusing to instruct the jury that a witness's anger directed toward the defendant, could be considered in weighing the testimony of that witness. She argues that the court's oral charge did not specifically instruct the jury that it could consider the witness's "prejudice, anger, or ill will," as specified in requested defense charge number 10.
The requested jury charge is as follows:
 "If any or all of the witnesses for the State have exhibited or admitted bias, prejudice, anger, or ill will against the Defendant, or from all the evidence in the case you find bias, prejudice, anger, or ill will on the part of all or any of the State's witnesses, and if these things, when considered by you in connection with all the other evidence in this case, create in your minds a reasonable doubt of Defendant's guilt, you should acquit."
The Court stated the following during its oral charge:
 "An issue in all cases is the credibility of the witnesses who testify. You will have to first determine the truthfulness and honesty of the witnesses and then the weight to be given to their testimony. You should give the testimony of each witness such weight as in your judgment [it] is fairly entitled to receive. You're the sole judges of the credibility of the witnesses. If there is any conflict in their testimony, your function is to resolve the conflict and determine the truth. In determining the credibility of a witness and the weight to be given to his or her testimony, you may and should consider the following. The conduct and demeanor of the witness while testifying, their frankness or lack of frankness while testifying, the reasonableness, or unreasonableness of their testimony, the witnesses' knowledge of *Page 911 
the facts for which he or she was testifying, the accuracy of the witnesses' recollection, and the degree of intelligence shown by the witness.
 "You should also take into consideration the character and appearance of the witness at trial, and any [bias][3] she or he has shown in her or his testimony and determine the credit to be given to her or his testimony."
Files argues on appeal that the requested charge was warranted because Moreno's testimony "seethes with hostility and anger toward Defendant" and her "explosive conduct was so severe as to require the trial court to take a short recess." The trial transcript does not support Files's claim.
Files states that the conduct at issue occurred during the prosecutor's direct examination. The comments actually were made during redirect examination, after Moreno gave an answer that she had been unable to give during cross-examination the previous day. Defense counsel had asked if Moreno had altered one of her notes to make it say that Jones's feeding tube had been off for 13 or 14 hours, instead of 3 or 4. Moreno clearly was upset by the question, and by other questions posed by the defense that implied that she was having financial difficulties, that she resented Files's treatment of her, and that she had been fired. After Moreno testified during redirect as to how she had calculated the 13- to 14-hour period, defense counsel objected, "This woman is spitting out venom, Judge." The court overruled the objection and instructed Moreno to "take a couple of deep breaths." Moreno then testified concerning a conversation in which, in essence, Files stated that Moreno was suspicious of her because Moreno had been taking care of elderly patients for too long and Moreno responded that there was nothing mentally wrong with her and she was suspicious because she had never seen such behavior before.
The transcript then reflects the following:
 "THE COURT: Let me interrupt you again and ask you to relax a little bit, you know. Okay. And don't raise your voice and get so excited. And I'm not scolding you. I'm just telling you to get a little more relaxed about it if you can.
"A. She [Files] tried to act like I was going crazy.
 "THE COURT: What I'm telling you this is something I've learned about myself and I understand it works on other people. If you get into a situation, and I know you don't testify in court everyday. And I know this is a different situation. If you get a little hyper or upset, if you will slow down and breathe deeper it will relax you."
In Harris v. State, 539 So.2d 1117 (Ala.Crim.App. 1988), this court held that the trial court's refusal to give the same instruction requested by Files was not error. Files argues that the instruction should have been given in the present case because, here, unlike Harris, a witness had expressed anger toward her. Files objected after the court's oral charge that "bias and anger" had not been sufficiently covered.
The trial court commented that Moreno was "excited," "hyper," and "upset" because she was inexperienced in court proceedings. It also was clear that Moreno had been upset by the questioning by Files's counsel. The trial court's comments indicate that Moreno's testimony concerning her conversation with Files evidenced disbelief or amazement, rather than anger. The trial court did charge that the jury could evaluate and weigh a witness's testimony, and that it was free to *Page 912 
reject any testimony that it found lacked credibility. The jury members were present to observe the witness's conduct and arrive at their own conclusions as the judges of fact. Files suffered no prejudice because of the trial court's refusal to give the requested instructions, nor did the trial court abuse its discretion by failing to instruct the jury using the exact wording of the requested instruction. Freeman v. State, 722 So.2d 806, 810
(Ala.Crim.App. 1998).
AFFIRMED.
Cobb, Baschab, Shaw, and Wise, JJ., concur.
[1] An additional charge of reckless murder was dismissed before trial.
[2] Files did not object at trial that the answer was nonresponsive, and she does not challenge the court's ruling on her hearsay objection on appeal.
[3] In an apparent clerical error, "bias" was transcribed as "advice."